UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DUNG TRAN,

        Petitioner,

     v.

JEFF MACOMBER,

        Respondent.

Case No.  11-cv-00877-CW

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

INTRODUCTION

    Petitioner Dung Tran, a prisoner of the State of California, filed this pro se action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the reasons discussed below, the Court DENIES the amended petition for writ of habeas corpus.

BACKGROUND

I.   Procedural History

    Following a jury trial in Santa Clara County Superior Court, Petitioner was convicted of first degree murder and was found to have personally used a firearm in the commission of the offense. He was sentenced to twenty-nine years to life in prison.

Petitioner appealed.  The California Court of Appeal affirmed the judgment of conviction in an unpublished opinion on August 21, 2009.  The California Supreme Court denied the petition for review on November 19, 2009.

Petitioner then filed this action.  Within a week of filing his petition, Petitioner filed an amended petition.  See Dkt. Nos. 1 and 3.  The Court issued an order to show cause, directing Respondent to answer the amended petition.  Respondent filed an answer on July 21, 2011.  At Petitioner's request, this action was stayed and administratively closed on August 10, 2012 so that he could exhaust state court remedies as to two claims.  On January 8, 2014, Petitioner filed a motion to lift the stay and reopen the action together with a first amended petition for writ of habeas corpus.  On March 18, 2014, the Court granted the motion and ordered Respondent to show cause why the first amended petition should not be granted.  Later, the Court granted a motion to dismiss on the ground that the new claims in the first amended petition were procedurally defaulted.  Petitioner eventually filed his traverse on June 17, 2015.

II.  The Crime

The California Court of Appeal described the evidence at trial.  That lengthy summary is quoted here because Petitioner's claims require consideration of some of the facts.  Specifically, all of his claims involve evidence regarding his mental state at the time of the killing, including provocation and intoxication.

> On December 10, 2003, defendant went to his friend Frank Shelton's house, and over the course of several hours, they drank beer and smoked crack cocaine. Defendant said he was unhappy, sad, and depressed

United States District Court
Northern District of California

because his wife, Tram Vo, was working in a
restaurant, and he thought she was seeing another man,
although she denied it.  At one point, defendant spoke
on the phone to Vo and a man named Son.  Defendant
said that Son challenged him and said that if he
wanted anything, they would have to meet.  According
to Shelton, defendant sounded shocked and frustrated.
He said he was upset by the way Son was talking to him
and wanted to meet him.

Defendant asked Shelton if he could borrow a gun to
threaten and scare Son.  Shelton suggested a different
weapon, but ultimately called a friend, who came by
with a box containing a gun and a loaded clip.
Shelton knew nothing about guns.  Privately, the man
showed Shelton how to insert and remove the clip and
use the slide to advance the bullets.  He told Shelton
to be careful because the gun was loaded.  Shelton
then showed defendant how to insert and remove the
clip.  According to Shelton, defendant was nervous
holding the gun, frustrated, and angry.  Defendant
then put the gun and clip inside his laptop case and
left, saying he was headed for Vo's restaurant.
Shelton told him to be careful.  Defendant did not
appear intoxicated when he left.

Around midnight or shortly thereafter, defendant's
mother, Nga, heard defendant say, "[M]om, something
[is] happening to my wife."  Nga woke defendant's
sister, Lya, and asked her to see what the commotion
was about.  Defendant was rushing around in the
hallway, very agitated and repeatedly saying to call
911.  Nga told him to call.  Nga and Lya saw Vo on the
bed in the master bedroom.  Lya saw blood coming from
her mouth and tried to wake her up.

Defendant came into the room.  He was on the phone
with a 911 operator.  He was hysterical and screaming
for help.  He gave his address to the operator and
said that his wife was conscious but bleeding from her
mouth.  He could not tell if she was breathing.  He
said that someone had shot her, but he did not know
where, when, or how it had happened.  The operator
gave him CPR instructions, which he followed, but he
could not see or hear any breathing.  Defendant then
gave the phone to Lya, who also tried to revive Vo.
When defendant was back on the phone, the operator
asked if there was a gun in the house.  Defendant said
no. Within a short time police and emergency personnel

arrived.   [Footnote omitted.]

At that time, defendant was in the driveway holding a phone.  He was hysterical, and his clothes were bloody.  Police found Vo on the bed.  She was dead. Defendant said he did not know what had happened. There was a trail of blood from the garage door, through a hallway, into the bedroom.  There were substantial pools of blood in the hallway and two bloody handprints on the carpeted areas.  According to the prosecution's expert, blood had oozed directly from the source onto the carpet.  The expert opined that the bloodstains were consistent with a bleeding body being dragged down the hall.

Officer Jaime Almaraz of the San Jose Police Department interviewed defendant at the house. Defendant said he had spoken to Vo around 10:00 p.m. and expected her home around midnight.  He went to bed.  Later, he woke up, saw blood coming from her mouth, and called 911.  He tried to resuscitate her and then went outside to wait for help.

Detective Raymond Barrera also interviewed defendant at the house.  [Footnote omitted.]  Defendant cried at times. He said that he had spent most of the day and evening with Shelton.  He said he drank about five beers, spoke to Vo around 10:00 p.m., and went home around 10:45 p.m.[4]  He said Vo usually got home around 12:15 a.m. He got into bed and fell asleep.  The next thing he knew was that the bed was shaking, and he woke up. Vo was next to him.  Defendant denied that he and Vo were having marital problems.  However, everyone knew that they had problems, had separated, and had reunited during the last two weeks.

> Footnote 4: Nga testified that sometime around 10:00 p.m. she heard the garage door open.  She heard the garage door again sometime after midnight.  Shortly thereafter, she heard defendant yelling about Vo.  She did not hear any arguing or gunshots.
>
> Lya too did not hear any arguing or gunshots before she heard defendant yelling for help

After these interviews, defendant went to the police station and was interviewed again.  [Footnote

omitted.]  For over half the interview, defendant reiterated his previous story, acting as if he did not know how Vo was injured or killed and claiming that he simply woke up and found her bleeding from the mouth.

However, at one point, he said he would tell the truth if he could go home.  Defendant said he was depressed. He said that Shelton told him that he had just bought a gun, and defendant asked to borrow it.  Shelton tried to dissuade him but brought it out and gave it to defendant.  Defendant said he tested the gun, cocking it with the clip out and pulling the trigger until he heard it click.  He put the gun into his laptop case and then left.  He said that at home, he put the gun on a table in the bedroom and went to bed. When Vo came home, he woke up, and they argued about her calling a man on her phone.  Defendant said that Vo saw the gun and grabbed it.  He grabbed it back, and they struggled for it back and forth.  He said he removed the clip, and they continued to struggle for it.  Vo said that if he could not put the past behind him, she wanted to die.  He then pushed her back onto the bed.  At that point, he lost control.  Thinking that the gun was empty because he had removed the clip, he pulled the trigger, and it fired.  He then left the house, tossed the gun into his neighbor's yard, and called the police.  He claimed it was all an "accident."  He did not know where the shell casing was.  He said that the pools of blood in the hallway came from his hands and pants.

During the interview, police located the gun in the backyard of a house across the street from defendant's house.  The clip was in it, but no bullet was in the chamber.  The prosecution's gun expert testified that normally, if a clip is in a gun when it is fired, a new bullet would automatically enter the chamber. . . .

An examination of Vo's body revealed gunshot residue on her hand, indicating that it was as close as six inches away from the gun when it was fired.  Vo died from a close-range gunshot to her head, which would have immediately incapacitated her.

The Defense
Defendant testified that in the fall of 2003, he and Vo were having marital problems and argued.  Both had lost their jobs and were having financial difficulties, they had two small children, and

defendant was using crack cocaine on a daily basis.
They separated and lived apart for a few months.  He
started seeing a woman, with whom he had sex and took
drugs, and remained in touch with her up to the time
of the shooting.  In November 2003, he and Vo
reunited, and she took a job at a restaurant to help
support the family.

A few days before he shot Vo, defendant discovered
that one night, Vo had called a man named Son Nguyen
on her cell phone, and they spoke for three hours.  He
became angry and jealous.  He argued with Vo about the
call and threw the bedroom phone against the wall,
breaking it.  Vo said that she and Son were just
friends, but defendant did not believe her.  By this
time, defendant had started a new job but was spending
$200 a week on drugs.  He also wanted Vo to quit her
waitress job, which had made him feel unhappy and
ashamed.

The day of the shooting, defendant told Vo he was
going to work, took the money she had earned the night
before, and left with his laptop.  However, he went to
Frank Shelton's home to drink beer and smoke crack.
Although he told Vo he had quit taking drugs, he
continued to do so, and his habit and financial
situation made him sad and depressed.  Around 8:00
p.m., he used his laptop to check Vo's cell phone
records.  He remembered her call to Son, and it
rekindled his anger and jealousy [sic].  Around 9:00
p.m., he called Vo at the restaurant and reminded her
to quit.  She agreed to do so.  They also spoke again
about the call to Son.  She told him that they were
just friends.  She said that Son was there if
defendant wanted to talk to him.  Defendant felt that
Son was challenging him, and when he got off the
phone, he immediately asked Shelton for a gun so that
he could confront and scare Son away from Vo.

Shelton tried to dissuade defendant for a while, but
ultimately Shelton's friend came over with a gun.
Defendant had no experience with guns, and Shelton
showed him how to remove and load the clip, saying the
gun was safe when the clip was out.  Defendant
inserted the clip into the gun, put the gun in his
laptop case, and left.  He testified that he headed
for the restaurant to confront Son with the gun, but
he changed his mind and went home because he "was a
coward and [had] chicken[ed] out."[6]

6

Footnote 6:  Defendant later backtracked, testifying that he did not intend to initially confront or scare Son with the gun.  He said he planned to leave the gun in his car, confront Son, and retrieve the gun only if Son did something.  Defendant knew nothing about Son but nevertheless felt he needed a gun because Son might be a gang member.

At home, defendant remained angry and jealous.  He brought the laptop case into the bedroom.  Initially, he testified that he intended to confront and scare Vo with the gun so she would stop seeing Son. He wanted her to know he was serious.  However, defendant later testified that he intended to talk to Vo without the gun and use it only if Vo escalated the argument.  He went to bed with his clothes on and fell asleep.

Vo came home later that night after her shift at the restaurant.  Defendant woke and asked her about quitting and Son.  When Vo said she did not want to talk, defendant became enraged, retrieved the gun, removed the clip, and threatened to confront Son with it if she did not talk.  Defendant said that Vo panicked and lurched for the gun, and they struggled for it back and forth.  At one point, defendant pushed her back onto the bed and fell on top of her.  They were yelling at each other.  Vo was upset and asked, "You want me to die ... ?"  Defendant then snatched control of the gun.  His finger was on the trigger. He did not intentionally pull the trigger.  It fired accidentally.  He did not know that there was a bullet in the chamber and did not think it was loaded.  He thought it was safe.  He did not intend to kill or harm Vo.[7]

Footnote 7:  Defendant denied telling police that he was trying to scare Vo or that he intentionally pulled the trigger.  He acknowledged that during his interview, he indicated that he might have pulled the trigger on purpose, but he did not mean that he had done so.  He said the police forced him to say that.  He meant only that he did not intentionally pull the trigger.

7

After the shooting, defendant tried to call 911, but the phone was broken. He screamed for Nga to call 911. He then put the clip back into the gun, left to throw the gun into his neighbor's yard, and returned to call 911. He followed CPR instructions from the operator and got blood all over his hands and clothing. He did not know how so much blood got into the hallway but said he made some trips through the hallway. He denied moving Vo's body.

Concerning the gun, defendant did not know whether Shelton had recently bought the gun, and he could not recall whether he told police that Shelton had just bought it. Defendant also denied that he tested the gun at Shelton's by removing the clip, cocking the gun, and pulling the trigger until he heard it click. He said he lied about doing so because he wanted to make the police think that he had done everything he could to make sure the gun was safe. He also said that after the shooting, he put the clip back in the gun because he did not want the police to find evidence of the gun in the house.

Defendant admitted that he lied to the 911 operator and the officers who first spoke to him at his home. He said he lied to the operator because he was afraid to admit the shooting. He said he lied to the officers at his home because he wanted to avoid going to jail. Defendant also said that he initially lied to the officers at the station and delayed telling them the truth because he thought he would be able to go home.

A defense expert opined that the blood pools in the hallway were consistent with defendant's story about performing CPR and traveling back and forth down the hallway.

People v. Tran, No. H031840, Cal. Ct. App. Aug. 21, 2009 opinion (hereinafter, Tran) at 2-8 (footnotes omitted where noted).

LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death

Penalty Act (AEDPA) of 1996, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A federal court on habeas review may not issue a writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ.  Id. at 409.  The factual determinations by state courts are presumed correct unless there is "clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  In the present

case, the California Court of Appeal is the highest court that addressed Petitioner's claims in a reasoned opinion.

DISCUSSION

I.   Ineffective Assistance of Counsel Claim

Petitioner contends that he was denied his Sixth Amendment right to effective assistance of counsel because counsel failed to request a jury instruction on the lesser included offense of heat-of-passion voluntary manslaughter.

A.   Heat-of-passion Voluntary Manslaughter

In California, the crime of voluntary manslaughter is a lesser included offense of the crime of murder.  People v. Beltran, 56 Cal. 4th 935, 942 (2013).  "Murder is the unlawful killing of a human being . . . with malice aforethought."  Cal. Penal Code § 187(a).  "Manslaughter is the unlawful killing of a human being without malice."  Id. at § 192.  If the killing without malice is done "upon a sudden quarrel or heat of passion," it is voluntary manslaughter.  Id. at § 192(a). Voluntary manslaughter based on a heat-of-passion theory has both a subjective and an objective component.  See People v. Cole, 33 Cal. 4th 1158, 1215–16 (2004).  For the subjective component, "[t]he defendant must actually, subjectively, kill the victim in the heat of passion, that is, anger, rage, or any violent, intense, high-wrought or enthusiastic emotion, except revenge, including fear of death or bodily harm."  Tran at 9. The objective component requires that the defendant's passion have an objectively reasonable basis.  Id.  That is, "[t]here must be evidence that the victim provoked the defendant, and that provocation must be sufficient to cause an "'"'ordinary [person]

of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than judgment.'"'"  Id. (omissions and second alteration in original). The provocation need not be such that it would prompt an ordinary person of average disposition to kill someone, but only that it "would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'"  Beltran, 56 Cal. 4th at 957 (quoting People v. Logan, 175 Cal. 45, 49 (1917)).

Under California law, the state of the evidence determines whether the jury must be instructed on a lesser-included offense. An instruction is required "'whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury.'"  Tran at 10 (citation omitted).  The evidence is substantial when it is evidence from which a jury could conclude "'that the lesser offense, but not the greater, was committed.'"  Id. (citation omitted).

B.   State Court Decision

The California Court of Appeal rejected Petitioner's claim that counsel was ineffective in not seeking a heat-of-passion jury instruction, and gave two reasons.  First, there was neither deficient performance nor prejudice in the failure to request a heat-of-passion instruction because the evidence did not warrant such an instruction.  Although there was sufficient evidence, if believed, to establish the subjective component of a heat-of-passion voluntary manslaughter, i.e., that Petitioner acted under heat of passion, there was not sufficient evidence to establish the objective component, i.e., that there was provocation

United States District Court
Northern District of California

sufficient to cause an ordinary person to act rashly and from

passion rather than judgment.  Tran at 10-11.

> [T]he only evidence of provocation is that in the days
> before the shooting, defendant discovered that Vo had
> had a long telephone call at night with Son. Although
> defendant suspected an affair, Vo denied it and said
> she and Son were just friends. On the day of the
> shooting, defendant spoke to Vo from Shelton's house.
> She reiterated that she and Son were just friends and
> invited defendant to come to the restaurant to talk to
> Son himself. Later that night, when she got home from
> work, she did not want to discuss her job or Son.
>
> . . . That Vo had once spoken to Son on the phone and
> perhaps saw him at the restaurant and did not want to
> discuss her job or Son when she got home from work
> late at night would not, in our view, cause an
> ordinarily reasonable person to believe that Vo was
> having an affair or otherwise arouse the passions of a
> reasonable person and cause him to act rashly from
> passion rather than judgment. This is especially so
> because Vo had repeatedly denied that she was having
> an affair.

Tran at 11.  Based on the evidence at trial regarding the

victim's conduct, "defense counsel reasonably could have thought

that there was insufficient evidence to establish the objective

component for heat of passion."  Id.

Second, the California Court of Appeal determined that trial

counsel may have chosen not to pursue a heat-of-passion theory

for the separate reason that such a theory had the potential to

weaken the defense of involuntary manslaughter based on an

accidental shooting.  See Tran at 14.  The defense of an

accidental shooting was consistent with Petitioner's testimony

that the gun fired by accident, rather than that he had shot his

wife in an impassioned state due to her alleged infidelity.

Defendant's credibility already was questionable due to

inconsistencies between his trial testimony and the statements he made at the time of the shooting. "Under the circumstances, defense counsel could have reasoned that any marginal benefit from asserting an additional but factually weak theory was outweighed by its potential to undercut defendant's testimony that the shooting was unintentional and accidental and thereby undermine his claim of involuntary manslaughter." Id.

C.   Analysis of Federal Habeas Claim

The Sixth Amendment's right to counsel guarantees not only assistance, but effective assistance, of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id. In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must establish two things. First, he must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. The relevant inquiry under Strickland is not what defense counsel could have done, but rather whether his choices were reasonable. See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

United States District Court
Northern District of California

A "doubly deferential" standard of judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254.  See Cullen v. Pinholster, 563 U.S. 170, 202 (2011).  The "question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Harrington v. Richter, 562 U.S. 86, 105 (2011).

The California Court of Appeal's rejection of Petitioner's ineffective assistance of counsel claim was not contrary to or an unreasonable application of Strickland.  That court correctly identified the standard and reasonably applied it.[1]

---

[1] In the part of its opinion describing the deficient performance prong of an ineffective assistance of counsel claim, the California Court of Appeal stated, "Where the record on direct appeal 'does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation.'"  Tran at 8 (quoting People v. Anderson, 25 Cal. 4th 543, 569 (2001), overruled on other grounds in People v. Berryman, 6 Cal. 4th 1048, 1081 n.10 (1993)).  This statement was not a modification of the Strickland standard.  The statement instead reflects the limitations of California appellate review and applies when an ineffective assistance claim is made on direct appeal rather than in a habeas petition.  That it is an appellate review standard can be discerned from Anderson's citation to People v. Pope, 23 Cal. 3d 412, 426 (1979), overruled on other grounds in Berryman, 6 Cal. 4th 1048, in support of the proposition.  Pope explained that, where the record on direct appeal sheds no light on the reason for counsel's conduct, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal" to avoid a reversal simply due an incomplete record where there may be legitimate reasons for counsel's conduct.  Pope, 23 Cal. 3d at 426.  Pope further explained that "[w]here the record does not illuminate the basis for the challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a petition for habeas corpus," where evidence can be developed as to counsel's reasons.  Id.

United States District Court
Northern District of California

1       This was not a case in which trial counsel simply overlooked

2  the possibility of a voluntary manslaughter theory.  After the

3  jury instruction conference, the trial judge memorialized that he

4  and counsel "had lengthy discussions regarding any lesser-

5  included offenses."  RT 906.  Although defense counsel had

6  requested instructions on involuntary manslaughter, "[b]oth

7  parties also agreed that there is no evidentiary basis to warrant

8  an instruction on voluntary manslaughter."  Id.

9       Although provocation takes center stage in Petitioner's

10  habeas action, it played just a bit part at the trial and no role

11  in explaining how the fatal bullet exited the gun.  Defense

12  counsel reasonably could have chosen not to request a jury

13  instruction for which there was weak or an inadequate evidentiary

14  basis.  It was not an unreasonable application of the Strickland

15  standard for the state appellate court to conclude that counsel

16  had not performed deficiently in not requesting a jury

17  instruction that was unsupported by the evidence.  The Supreme

18  "Court has never required defense counsel to pursue every claim

19  or defense, regardless of its merit, viability, or realistic

20  chance for success."  Knowles v. Mirzayance, 556 U.S. 111, 123

21

22       Here, had Petitioner desired to present evidence outside the
appellate record to prove ineffective assistance of counsel at

23  trial, he could have filed a state court petition for writ of
habeas corpus asserting that claim and presenting the evidence.

24  He did not do so.  The California Court of Appeal's statement
about direct appeal review of ineffective assistance of counsel

25  claims did not render its decision contrary to or an unreasonable
application of Strickland, which itself recognized that reviewing

26  courts "must indulge a strong presumption that counsel's conduct
falls within the wide range of reasonable professional

27  assistance."  466 U.S. at 689.

28

(2009).

Petitioner argues strenuously that the evidence did show heat of passion so that counsel should have argued for the instruction to be given.  Petitioner's argument fails to persuade because the state appellate court determined that the evidence was insufficient to warrant an instruction on heat-of-passion voluntary manslaughter as a matter of state law.  This Court could not grant habeas relief for a state law error, even if there was one.  See Swarthout v. Cooke, 562 U.S. 216, 219 (2011). In any event, almost all the testimony Petitioner identifies in support of his argument that there was substantial evidence of provocation pertains to the subjective component rather than the objective component of heat of passion.  See Dkt. No. 1 at 22. The state appellate court reasonably determined that the limited part of the cited testimony that actually pertains to the objective prong does not show provocation sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than judgment.  Petitioner's friend Shelton testified that Petitioner did not tell him that Petitioner's wife admitted having an affair, RT 380; instead, Petitioner told him his wife had denied having an affair and had invited Petitioner to "come down and see" if Petitioner did not believe her.  RT 380-81. Petitioner's own testimony does not show provocation by his wife, and instead suggests efforts to avoid provoking him: days before the shooting, his wife told him that Son was just a friend, RT 750; in a phone call on the day of the killing, his wife told him that he could come to the restaurant to talk to Son, RT 763; and,

just before Petitioner shot her, his wife said she did not want to talk about things, RT 773.  Petitioner's testimony also does not show any provocation by Son.  Petitioner never talked to Son and did not know anything about him.  RT 762, 765-66.

The California Court of Appeal's separate determination that the deficient performance prong had not been established because there was a strategic reason to forego the jury instruction also was not an unreasonable application of <u>Strickland</u>.  Foregoing pursuit of a theory that was inconsistent with Petitioner's testimony was a reasonable strategy.  Had a heat-of-passion theory been pursued, counsel would have been in the position of urging that the shooting was an accident but, if not an accident, then the victim provoked it.  Making such an argument would have made both theories -- the shooting was an accident and the victim provoked Petitioner's rash conduct -- less believable to the jury.  And, although provocation and accident were not mutually exclusive, the more the defense emphasized that Petitioner was provoked to act rashly, the less likely it was that the jury would have believed that a subsequent rash act was an accident.  Arguing that Petitioner had acted due to provocation also had the potential to make the jury think Petitioner was blaming the victim, which easily could have alienated the jury in light of the evidence that she denied having an affair and that he shot her in the face at very close range.  <u>See</u> RT 678 (gun was fired from a distance of six inches); RT 712-14 (bullet entered at corner of her mouth and lodged at the back of her brain).  Counsel already had a difficult task of dealing with his client's significant credibility problems caused by Petitioner having

denied being the shooter when he spoke to the 911 operator as well as when he first spoke to police.  It would have been reasonable for counsel to devote his efforts to convincing the jury that Petitioner was truthful at trial when he said the shooting was an accident, and forego a heat-of-passion theory for which there was so little evidentiary support.  See Knowles, 556 U.S. at 122, 124 (abandoning a defense that has "almost no chance of success" is reasonable, even if there is "nothing to lose" by preserving the defense).

Petitioner has failed to show a reasonable probability of a different outcome if counsel had requested a jury instruction on the lesser included offense of heat-of-passion voluntary manslaughter.  The evidence that, days earlier, his wife had a three-hour telephone conversation with a man (who she said was just a friend), and her statement that she did not want to talk about Petitioner's accusations that she was having an affair (when he raised them for the third time as she arrived home from work after midnight) did not provide evidence substantial enough to merit consideration of heat-of-passion voluntary manslaughter by the jury.  Counsel's failure to request the instruction did not result in any prejudice because Petitioner was not entitled to the instruction as a matter of state law.  Moreover, even if counsel had requested the instruction and even if the court had instructed the jury on heat-of-passion voluntary manslaughter, there is no reasonable probability that it would have altered the outcome of the proceedings in light of the weakness of the evidence of heat of passion.

Petitioner argues that the trial court recognized that there was enough evidence of provocation to warrant an instruction, as shown by the fact that the trial court instructed on provocation as it relates to first and second degree murder.  See Dkt. No. 3 at 24.  Petitioner confuses concepts.  The instruction given on provocation as it relates to first and second degree murder, CALCRIM 522, is not identical to the provocation required for heat-of-passion voluntary manslaughter.  Unlike the heat-of-passion provocation, CALCRIM 522 "does not reasonably imply that there is an additional requirement that the provocation must also be enough to cause a reasonable person to act rashly."  Tran at 16.  Petitioner acknowledges that they are two different kinds of provocation elsewhere in his brief.  See Dkt. No. 3 at 27 ("[t]here are, of course, two distinct legal definitions of provocation under California law"); id. (the provocation that reduces first degree to second degree murder "contains only a subjective component").

Taking a "'highly deferential' look at counsel's performance" though § 2254(d)'s "'deferential lens,'" Cullen v. Pinholster, 563 U.S. at 190 (citations omitted), it cannot be said that the California Court of Appeal's rejection of Petitioner's claim was contrary to or an unreasonable application of Strickland.  The California Court of Appeal's analysis presents a "reasonable argument that counsel satisfied Strickland's deferential standard," and that is sufficient to bar relief under § 2254(d).  See Harrington v. Richter, 562 U.S. at 105.  Petitioner is not entitled to the writ on this claim.

II.   Instructional Error Claim:   Failure to Define Provocation

     At Petitioner's trial, the jury was instructed on first and second degree murder, as well as involuntary manslaughter.   The court also instructed the jury that "[p]rovocation may reduce a murder from first degree to second degree. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder, but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."   CT 806 (see CALCRIM No. 522.)

     Petitioner contends that the trial court's failure to further define the term "provocation" violated his rights to due process and to present a defense.   Petitioner asserts that a definitional instruction was necessary to inform the jury that the defendant need only have been subjectively provoked -- even if a reasonable person would not have been provoked -- for a killing to be reduced from first to second degree murder.   He urges that, without a definition of provocation, his "jury never knew that provocation could reduce a homicide to second degree murder even if not objectively sufficient to provoke a reasonable person."   Dkt. No. 3 at 28.

     A.   State Court Decision

     The California Court of Appeal rejected the claim of instructional error.   The California Supreme Court had previously determined that, "as used in the instruction concerning the reduction of murder from first to second degree, provocation bore its 'common meaning' and 'required no further explanation in the

United States District Court
Northern District of California

absence of a specific request." <u>Tran</u> at 16 (quoting <u>People v. Cole</u>, 33 Cal. 4th 1158, 1217-18 (Cal. 2004)).  Following that binding precedent, the state appellate court concluded that, as a matter of state law, the instruction was sufficient and the term "provocation" needed no further definition.  <u>Tran</u> at 16.

The court continued:

> Moreover, when we analyze a claim that an instruction was inadequate, we focus on the entire charge to the jury in light of the evidence and the arguments of counsel and determine whether there is a "reasonable likelihood" that the jury misunderstood the challenged instruction in the manner suggested by the defendant. (<u>Estelle v. McGuire</u> (1991) 502 U.S. 62, 72; <u>Boyde v. California</u> (1990) 494 U.S. 370, 378-381; <u>People v. Holt</u> (1997) 15 Cal. 4th 619, 677; <u>People v. Clair</u> (1992) 2 Cal. 4th 629, 663; <u>People v. Dieguez</u> (2001) 89 Cal. App. 4th 266, 276.)
>
> CALCRIM No. 522 invites the jury to decide whether the defendant was provoked and allows the jury to consider the fact that the defendant was provoked in determining the degree of murder. The instruction does not reasonably imply that there is an additional requirement that the provocation must also be enough to cause a reasonable person to act rashly.
>
> Moreover, in closing arguments, neither party suggested such a requirement. Indeed, as the Attorney General accurately observes, provocation was not a particularly critical issue for the prosecution or the defense. Both parties noted that defendant was angry and jealous. However, the prosecutor argued that those emotions motivated defendant to plan the murder and lie in wait for his victim. Defendant's mental state was also the key to his defense. However, contrary to defendant's claim, he did not assert a "provocation defense" or argue that provocation prevented him from forming the mental state needed for murder or reduced the murder to second degree murder. The defense was that there was no murder because he did not harbor express malice, intend to kill, or consciously disregard a dangerous risk. Rather, he thought a gun was safe once the clip is removed; he believed the gun was unloaded because he

United States District Court
Northern District of California

had taken the clip out; he did not know that there was
a bullet in the chamber; he did not intend to shoot Vo
or even pull the trigger; and the gun fired
accidentally as they struggled for it. This is not a
provocation defense; it is mistake of fact and
accident.

Under the circumstances, it is not reasonably likely
that jurors would (or did) misinterpret CALCRIM No. 522
and erroneously think that to reduce murder from first
to second degree, provocation had to be objectively
reasonable.

Tran at 16-17.

B.   Analysis of Federal Habeas Claim

To obtain federal habeas relief for an error in the jury
instructions, a petitioner must show that the error "so infected
the entire trial that the resulting conviction violates due
process." Estelle v. McGuire, 502 U.S. 62, 72 (1991). "'A
single instruction to a jury may not be judged in artificial
isolation, but must be viewed in the context of the overall
charge.'" Middleton v. McNeil, 541 U.S. 433, 437 (2004)(quoting
Boyde v. California, 494 U.S. 370, 378 (1990)). "Even if there
is some 'ambiguity, inconsistency, or deficiency' in the
instruction, such an error does not necessarily constitute a due
process violation." Waddington v. Sarausad, 555 U.S. 179, 190
(2009) (quoting Middleton v. McNeil, 541 U.S. 433, 436 (2004)).
Where an ambiguous or potentially defective instruction is at
issue, the court must inquire whether there is a "reasonable
likelihood" that the jury has applied the challenged instruction
in a way that violates the Constitution. Estelle, 502 U.S. at 72
& n.4; Boyde, 494 U.S. at 380.

Due process includes a requirement that a defendant "be

afforded a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485 (1984); cf. Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (whether grounded in the Sixth Amendment right of compulsory process or the constitutional guarantee of due process, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'"). The right to present a defense includes adequate instructions on the defense theory of the case. See Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 2000). Petitioner does not suggest that his right to present a defense claim is any more expansive than a general due process claim. The alleged violation of his right to present a defense argument is therefore considered as part of the due process analysis.

If a constitutional error is found in the jury instructions, the federal habeas court also must determine whether that error was harmless by looking at the actual impact of the error. Calderon v. Coleman, 525 U.S. 141, 146-47 (1998). The habeas court must apply the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993), and determine whether the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008) (per curiam) (quoting Brecht, 507 U.S. at 623).

The California Court of Appeal's rejection of Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law. Petitioner has failed to show a reasonable likelihood that the jury understood the instruction to mean that the jury had to find that the provocation was such as would cause an objectively reasonable person to act rashly before

United States District Court
Northern District of California

considering whether that provocation should reduce the murder from first degree to second degree.  He suggests that it is possible that the jury understood the instruction to require provocation that was objectively reasonable, but "it is not enough that there is some 'slight possibility' that the jury misapplied the instruction."  Waddington v. Sarausad, 555 U.S. at 191 (quoting Weeks v. Angelone, 528 U.S. 225, 236 (2000)).  The California Court of Appeal explained that, as a matter of state law, there was no need to further define the provocation that could reduce murder from first to second degree because "provocation bore its 'common meaning.'"  Tran at 16.  The Ninth Circuit has similarly held that there is no duty to define terms that are concepts "within the jury's ordinary experience." United States v. Tirouda, 394 F.3d 683, 688 (9th Cir. 2005); see, e.g., id. at 689 (failure to define "accomplice" was not plain error); United States v. Dixon, 201 F.3d 1223, 1231 (9th Cir. 2000) (district court did not err in failing to define "commercial advantage" and "private financial gain" because the terms are within the comprehension of the average juror); United States v. Moore, 921 F.2d 207, 210 (9th Cir. 1990) (district court did not err in failing to define "violence" because it is a concept within the ordinary experience of a jury); Walker v. Endell, 850 F.2d 470, 475 (9th Cir. 1987) (no habeas relief for failure to define "recklessness"; under Alaska law, criminal recklessness "relates essentially to the common-sense definition of recklessness, which the average juror could understand and apply without an instruction").

        Petitioner also does not identify any other jury instruction

that would have led the jury to believe that there had to be provocation that would make a reasonable person act rashly before the jury could consider whether the provocation could reduce the murder from first degree to second degree.  The instructions given covered first and second degree murder.  The jury was instructed with a modified version of CALCRIM 520, which stated the elements of murder and explained malice aforethought.  CT 804-05.  The jury also was instructed with a modified version of CALCRIM 521, which instructed the jury to decide whether it was first or second degree murder.  CT 805-06.  CALCRIM 521, as modified, described the requirements for the prosecutor's two theories of first degree murder, i.e., premeditated murder and murder committed by lying in wait; after describing those requirements for first degree murder, the instruction informed the jury that "[a]ll other murders are of the second degree.  [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime.  If the People have not met this burden, you must find the defendant not guilty of first degree murder."  CT 806.  Nothing in those instructions suggested that provocation had to be sufficient to provoke a reasonable person before it could reduce the degree of a murder.

Moreover, the objective versus subjective nature of provocation was not at issue in this case.  Neither the prosecutor nor defense counsel argued or suggested that the provocation necessary to reduce murder from first degree to second degree had to be such as to make a reasonable person feel provoked.

Provocation was not central to the defense.  Petitioner points out that defense counsel argued in closing that "'the issue [in this case is] what was in Tim's mind at the time that he shot [Vo] Tram and that's pretty much the only issue in this case.'"  Dkt. No 3 at 26 (first alteration in original) (quoting RT 985).  This misunderstands the thrust of defense counsel's argument.  On the cited page of the transcript, defense counsel was making the point that the shooting was accidental due to Petitioner's mistaken belief that the gun was not loaded:

> Now the key instruction in this particular case is when a person commits an unlawful killing but did not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter.  It's still taking the life of another.  It's still doing an act that can't be undone.  But that's what involuntary manslaughter is.  <u>And the issue that you have to deal with was what was in Tim's mind at the time that he shot [Vo] Tram and that's pretty much the only issue in this case</u>.
>
> Now here's the instruction you are going to be given.  It's instruction 3406.  It's in your packet.  And it pretty much summarizes the essence of this case.  If the defendant believed that the gun was unloaded, he did not have the specific intent or mental state required for murder of the first degree or murder of the second degree.
>
> And more aptly put, the only issue that is before you, and remember who has the burden of proof, has the prosecutor proved beyond any reasonable doubt that Tim knew the gun was loaded.

RT 985 (emphasis added).  Defense counsel's closing argument repeatedly referred to the accidental nature of the shooting.  Counsel emphasized that Petitioner did not know about guns in general (RT 989, 1003, 1007); Petitioner removed the clip to make the gun safe (RT 998, 1005, 1008, 1016); Petitioner did not think

United States District Court
Northern District of California

the gun was loaded when he confronted Vo (RT 986, 989-90, 1014); and Petitioner did not intend to kill Vo (RT 986).  Defense counsel did not argue that Petitioner shot his wife because he, subjectively, felt provoked to act rashly.  And defense counsel did not make any effort to distinguish between subjective and objective provocation, because provocation was not the theory of the defense.

The prosecutor referred to provocation in his closing argument, but did so to support his theory that Petitioner's emotional state motivated him to plan the murder and lie in wait for his victim.  The prosecutor did not distinguish between objective and subjective provocation.

The failure to define a term with a common meaning that was not important to the defense theory of the case nor the prosecution's theory of the case did not "so infect[] the entire trial that the resulting conviction violates due process."  Estelle v. McGuire, 502 U.S. at 72.

Having found no error, the Court need not consider whether there was harmless error.  Petitioner is not entitled to the writ on this claim because the state court's rejection of his claim was not contrary to or an unreasonable application of clearly established law as set forth by the United States Supreme Court.

III. Instructional Error Claim:  Failure to Elaborate on Intoxication

At trial, the jury was instructed:  "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. [¶] You may consider that evidence only in deciding whether the defendant acted with an intent to kill or

the defendant acted with deliberation and premeditation."  CT 807

(CALCRIM No. 625).[2]

Petitioner contends that his right to due process was violated because the trial court failed to further instruct the jury "that it could also consider the intoxication evidence in determining the honesty of defendant's provocation."  Dkt. No. 3 at 30.  According to Petitioner, without further instruction, "the jurors received no guidance as to the effect defendant's intoxication had on the assessment of whether he was actually provoked."  Id. at 33.

A.   State Court Decision

The California Court of Appeal rejected Petitioner's claim that the trial court erred in failing to instruct further on intoxication as it related to provocation.

With regard to provocation for a heat-of-passion voluntary manslaughter theory, there was insufficient evidence of provocation to support instructions on the voluntary manslaughter theory; it followed, therefore, that the trial court "did not err in failing to instruct jurors sua sponte on voluntary intoxication as it relates to the subjective component of a heat-of-passion theory."  Tran at 18.

With regard to the provocation that may reduce murder from first to second degree, the further instruction would have been

---

[2] The instruction is based on California Penal Code section 29.4(b), which provides:  "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought."

"a form of pinpoint instruction that the trial court is not required to give in the absence of a request."  Id.

The California Court of Appeal held,

Moreover, the trial court's instructions adequately covered the issue. The court instructed jurors that to convict defendant of murder, the prosecution had to prove that defendant caused the death of another person and acted with malice—i.e., either an intent to kill or conscious disregard for actions that were dangerous to human life. (See CALCRIM No. 520.) The court instructed jurors that if they found that defendant committed murder, they had to decide whether it was first or second degree murder. (See CALCRIM No. 521.) Concerning first degree, the court instructed that the prosecution had to prove that the murder was committed willfully, deliberately, and with premeditation; or the murder was committed by lying in wait. (See ibid.) In particular, the court explained, "The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice, and knowing the consequences decided to kill. The defendant acted with premeditation if he decided to kill before committing the act that caused death." (See ibid.) On the other hand, "[a] decision to kill rashly, impulsively or without careful consideration is not deliberate and premeditated." (See ibid.) Concerning lying in wait, the court explained that jurors must find that defendant concealed his purpose, waited and watched for an opportunity to act, and intended to and did make a surprise attack on the person killed. Moreover, the duration of the lying in wait "must show a state of mind equivalent to deliberation or premeditation." (See ibid.)

As noted[,] that court instructed jurors that provocation may reduce a murder from first to second degree and said they could consider provocation in determining whether the killing was first or second degree. (See CALCRIM No. 522.) The court also instructed that the jury could consider evidence of voluntary intoxication in determining whether defendant acted with an intent to kill, deliberation, and premeditation. (See CALCRIM No. 625.)

> When read and considered together, these instructions
> permitted jurors to consider both voluntary
> intoxication and provocation at the same time in
> determining whether defendant acted with an intent to
> kill, deliberation, and premeditation and thus whether
> the murder was first or second degree. Moreover,
> nothing in the instructions prohibited the jurors from
> considering the connection between voluntary
> intoxication and provocation in determining whether he
> had the requisite mental state for first degree
> premeditated murder.

Tran at 18-20.

The California Court of Appeal separately determined that the instructional error claim had been forfeited due to counsel's failure to request the further instruction in the trial court. Id. at 20. The California Court of Appeal also rejected the argument that the forfeiture should be excused due to counsel's ineffectiveness. The record did not disclose why counsel did not request the instruction, but counsel "could have concluded that an additional instruction was unnecessary" because the other instructions "adequately covered the issue." Id. "This is especially so because defendant's own testimony does not suggest that when Vo came home after work, he was still under the influence of drugs and alcohol. Indeed, Shelton testified that when defendant finally left his house, he did not seem to be under the influence." Id.

B.    Analysis of Federal Habeas Claim

As mentioned in Section II, above, to obtain habeas relief on the alleged instructional error, Petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. at 72. "An omission, or an incomplete instruction, is less likely to be

prejudicial than a misstatement of the law." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977).

The California Court of Appeal's rejection of Petitioner's instructional error claim was not contrary to or an unreasonable application of clearly established Supreme Court authority. Petitioner fails to show that the absence of an instruction that intoxication could be considered in deciding whether he actually had been provoked "so infected the entire trial that the resulting conviction violates due process." <u>Estelle v. McGuire</u>, 502 U.S. at 72. He does not dispute the state appellate court's determination that the overall charge to the jury "adequately covered the issue," <u>Tran</u> at 20, when one considered the combined effect of the general instructions on murder (i.e., CALCRIM Nos. 520 and 521), the instruction that provocation could reduce murder from first to second degree (i.e., CALCRIM No. 522), the instruction that evidence of voluntary intoxication could be considered in determining intent to kill, as well as the instruction on deliberation and premeditation (i.e., CALCRIM No. 625). As the state appellate court explained, these instructions enabled the jury to consider both intoxication and provocation at the same time in determining Petitioner's mental state and the degree of murder. <u>Tran</u> at 19.

Petitioner also argues that counsel was ineffective in failing to seek a further instruction on intoxication. His ineffective assistance of counsel subclaim fails because he has not shown deficient performance, as the California Court of Appeal concluded. The evidence of intoxication was limited and equivocal. Although there was evidence that Petitioner had

consumed drugs and alcohol earlier in the day, he had last
consumed alcohol and drugs five hours before the shooting.  RT
805-06, 892.  Shelton testified that Petitioner did not appear to
be intoxicated when he left Shelton at about 11:00 p.m.  RT 405.
Petitioner suggested in his testimony that the effect of the
drugs had "dissolved" when he arrived home about a half hour
before his wife.  See RT 844, 892.  Petitioner also testified to
his actions showing clear thinking at about the time of the
shooting: he deliberately removed the clip from the gun allegedly
to make it safer, and he had the presence of mind to dispose of
the gun and cartridge in a nearby yard after the shooting.  RT
780, 857-58.  Not only was the evidence of intoxication weak,
encouraging the jury to ponder intoxication also might have
benefited the prosecution rather than the defense.  The
prosecutor argued that Petitioner felt angry, and that feeling
prompted Petitioner to get the gun and then to kill with
premeditation or by lying in wait.  RT 957, 961.  If intoxication
helped fuel Petitioner's festering anger, that feeling might have
made premeditation and lying in wait more likely.  See RT 961-62
(prosecutor arguing that, after smoking crack all day, Petitioner
went home and "watched and waited" for his wife to come home and
then made a "surprise attack").  Further, focusing on
intoxication undermined the defense theory of an accident, as
Petitioner testified and defense counsel argued that Petitioner
had taken specific steps so the gun would not fire.  See Knowles,
556 U.S. at 122-23 (abandoning a defense that has "almost no
chance of success" is reasonable, even if there is "nothing to
lose" by preserving the defense).  Trial counsel reasonably could

United States District Court
Northern District of California

have concluded that focusing the jury's attention on Petitioner's intoxication had more potential to harm than to help the defense. Such a strategic decision did not amount to deficient performance.

Petitioner is not entitled to the writ on his claim that his right to due process was violated by the failure to further instruct the jury on intoxication, nor on his subclaim that counsel provided ineffective assistance in not requesting a further instruction on intoxication.

CONCLUSION

For the foregoing reasons, the amended petition for a writ of habeas corpus is DENIED.

A certificate of appealability will not issue. See 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Petitioner's application for leave to proceed in forma pauperis on appeal is DENIED. Dkt. No. 41. The application is deficient in that it is not signed by Petitioner, and does not contain an affidavit in which Petitioner "claims an entitlement to redress" and "states the issues that the party intends to present on appeal." Fed. R. App. P. 24(a)(1). This denial is without prejudice to Petitioner filing an application in the United States Court of Appeals for the Ninth Circuit to proceed in forma pauperis on appeal. See Fed. R. App. P. 24(a)(5). Petitioner sent letters to the Court indicating his belief that the filing fee for an appeal in a habeas action is $5.00. He is

1   incorrect.  Although the filing fee for a habeas action in the

2   district court is $5.00, the filing fee for an appeal in a habeas

3   action is $505.00.

4       Petitioner is reminded that, if he wants to appeal the

5   denial of his amended petition for writ of habeas corpus, he must

6   file a timely notice of appeal.

7       The Clerk shall enter judgment and close the file.

8       IT IS SO ORDERED.

9   Dated: January 27, 2016



CLAUDIA WILKEN
United States District Judge